## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA DOHNER, | ) |
| | ) |
| Plaintiff, | )    CIVIL ACTION NO. 3:08-52 |
| | ) |
| v. | ) |
| | ) |
| CLEARFIELD COUNTY, PENNSYLVANIA, | )    JUDGE GIBSON |
| REX READ, Clearfield County Commissioner, | ) |
| in his individual capacity, MARK McCRACKEN, | ) |
| Clearfield County Commissioner, | ) |
| in his individual capacity, | ) |
| Defendants. | ) |

### MEMORANDUM OPINION and ORDER OF COURT

In this employment discrimination lawsuit, Plaintiff Lisa Dohner alleges that blatant gender discrimination caused the termination of her employment as Director of the Clearfield County Department of Children and Youth. Ms. Dohner avers that because Defendants felt that a man should have her job, she was specifically targeted for an investigation, and subsequently, unjustifiedly fired.

Amidst the intersecting allegations of egregious behavior, the Court finds numerous unresolved genuine issues of fact; consequently, Defendants' Motion for Summary Judgment will be denied.

### I. PROCEDURAL HISTORY

Before this Court for consideration is Defendants Clearfield County's, Rex Read's and Mark McCracken's Motion for Summary Judgment. Doc. No. 24. On March 8, 2008, Ms. Dohner filed a Complaint against Defendants, alleging claims of sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.* ("Title VII"),

as well as deprivation of equal protection of the laws in violation of the Equal Protection Clause of

the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983, and deprivation

of her rights under the First Amendment of the United States Constitution and 42 U.S.C. §1983.

Doc. No.1.  Defendants filed an Answer to Plaintiff's Complaint on April 30, 2008. Doc. No. 8.

Discovery in this matter was completed on November 23, 2008. Doc. Nos. 15, 19-20. Defendants'

Motion for Summary Judgment (Doc. No. 24), Brief in Support (Doc. No. 25), and Concise

Statement of Material Facts (Doc. No. 26) (hereinafter "DSOF"), were filed on February 27, 2009.

Plaintiff filed a Brief in Opposition to Defendants' Motion for Summary Judgment, (Doc. No. 31),

Response to Defendants' Concise Statement of Material Facts (Doc. No. 32) (hereinafter "PRSOF"),

and Concise Statement of Material Facts (Doc. No. 33) (hereinafter "PSOF"). On March 30, 2009.

Defendants thereafter filed a Reply Brief (Doc. No. 37) and Response to Plaintiff's Concise

Statement of Material Facts (Doc. No. 38) (hereinafter "DRSOF"), on April 24, 2009.

**II.     Factual Background**

Ms. Dohner and Defendants dispute nearly all of the facts in this case.

Ms. Dohner served as Director of the Clearfield County Department of Children and Youth

("CYS") from November, 2003 through March 28, 2006. DSOF, ¶¶ 1-4; PRSOF, ¶¶ 1-4.  Ms.

Dohner worked for Clearfield County CYS for nearly seventeen years prior to her firing, first as a

caseworker, and then, progressively, supervisor, supervisor/assistant administrator, and

administrator. PSOF, ¶ 2; DRSOF, ¶ 2. Ms. Dohner became Acting Administrator in August, 2003,

after the previous Administrator, Molly Muir left that position. PSOF, ¶ 3; DRSOF, ¶ 3.  Ms. Dohner

wrote a letter of interest in the position and received the position permanently in November 2003.

PSOF, ¶ 3; DRSOF, ¶ 3.  At the time of the termination of her employment, Ms. Dohner earned

2

$38,008. PSOF, ¶ 58; DRSOF, ¶ 58. In 2006, Mr. Read voted against a salary increase for Ms. Dohner. PSOF, ¶ 59; DRSOF, ¶ 59.

Ms. Dohner was fired on March 28, 2006. PSOF, ¶ 4; DRSOF, ¶ 4. According to Ms. Dohner, this happened "shortly after she complained that men were paid higher than her and informed the County Commissioners that one of their number had said he preferred a man in her position." PSOF, ¶ 4. Defendants state that Ms. Dohner was fired for a number of reasons, including poor work performance, inappropriate conduct, dishonesty and inability to manage CYS. DSOF, p. 2. Specifically, Mr. Read testified that in 2005 and 2006, there were concerns, in particular from Judge Ammerman, the President Judge of the Court of Common Pleas of Clearfield County, that "there was chaos" in the CYS office; Judge Ammerman believed the agency was in "tremendous turmoil" under Ms. Dohner's direction. PSOF, Ex. 4, p. 44: 1-5. Also, Mr. Read stated that "investigations" of Ms. Dohner revealed poor leadership of the agency. *Id.* Mr. Read testified:

> A. Using my words, that the agency was in tremendous turmoil. There was chaos. There were clicks, if you would, of the groups of people that, you know, were not getting along, you know, creating an unprofessional, you know, appearance. ...
>
> A. And, you know, demonstrated appearance, you know, whether it be from a public perception or an outside agency perception.....
>
> Q. Okay. So what was the appearance? You mean they were not presenting – well, I don't want to put words in your mouth. What was it that [Judge Ammerman] mentioned about this appearance issue?
>
> A. There was, you know, conflicting information. There seemed to be no true leadership. There seemed to be no, you know, sense of direction, you know, from the management that – you know, infighting, you know, could be a term used. You know, case workers did not get along. Supervisors did not get along.

PSOF, Ex. 4. Additionally, Mr. Read testified that there were issues with Ms. Dohner as early as 2005, which were brought up at meetings of the county commissioners, including concerning an

3

employee named Michelle Dotts, and also regarding Ms. Dohner's management of CYS, her general

professionalism in the office and her use of County funds. PSOF, Ex. 4, pp. 188:1-25; 193:1-25;

194:1-25.   Mr. Read testified that Ms. Dohner's management of CYS and discrepancies in her

mileage reimbursement reports were the principal reasons for the termination of her employment:

> Q.   So it's the mileage reimbursements and the inability to manage is
>       [sic] your reasons. Correct?
> A.   Yes.
> Q.   Okay. Now when you say "inability to manage," ... What do you
>       mean by that?
> A.   That [Ms. Dohner] was not a good manager. She was not– she did not
>       manage her staff well.
> Q.   In what way did she not manage her staff well?
> A.   She, from my perspective, was not able to communicate with them;
>       that she threatened them; that, you know, she made the agency out
>       there a – basically, a living hell; that there was dissension all the time;
>       and that she played one group or individual against others and would
>       randomly chance to, you know, whatever would accomplish what was
>       going on in her mind at any give time. ...
>
> Q.   Okay.  Did you ever sit down with [Ms. Dohner] and talk with her
>       about her management style at any point?
> A.   Yes.
> Q.   When would that have been?
> A.   That would have been conversations sometime in 2005 when we
>       discussed – when the commissioners discussed in particular the
>       management of Michelle Dotts.  There were several communications
>       in regards [sic] to that, that issue. ...
>
> A.   She made individuals, you know, feel– I'm not sure what word I want
>       to use, but, you know, less than what they were. Demeaned them.
>       That was the word I was searching for, you know, in her behavior . .
>       . .

PSOF, Ex. 4. Additionally, Defendants also reference complaints against Ms. Dohner in regard to

alleged sexual harassment, which Mr. Read admits was not part of the decision to fire Ms. Dohner.

*Id.* Furthermore, there was extensive discussion about Ms. Dohner's mileage reimbursements and

charity money. *Id.*

### "Sexual Harassment" Complaints

Ms. Dohner states that during discovery, Defendants claimed they terminated her employment as a result of sexual harassment complaints against her by female employees. PSOF, ¶ 67. In March 2006, a CYS caseworker, Tonia Weitosh wrote a letter to the Clearfield County Commissioner alleging that Ms. Dohner had called Ms. Weitosh a "lesbian" and made other comments and gestures related to her sexuality. DSOF, ¶ 50; PRSOF, ¶ 50. The County hired FeliceAssociates, Inc. to conduct an investigation of Tonia Weitosh's claims. DSOF, ¶ 51; PSOF, ¶ 51. At his deposition, Mr. Read testified that the allegations made by Tonia Weitish played no role in the decision to discharge Ms. Dohner. DSOF, Ex. H, p. 186.

### Mileage Reimbursement

Defendants state that they questioned trips for which Ms. Dohner submitted expense mileage reports, including trips to Clarion, Pennsylvania and to the Sarah Reed facility in Erie, Pennsylvania in 2005. DSOF, ¶¶ 24-29. Specifically, Defendants state that Ms. Dohner submitted mileage reimbursements for a trip to Clarion for a "PATSIS" meeting on October 6, 2005. DSOF, ¶ 24. However, according to Defendants, these meetings were held September 27, 2005 and October 7, 2005, and Ms. Dohner was not in attendance at either. DSOF, ¶ 25. Ms. Dohner states that she wrote on her report October 6, 2005, but that she attended the PATSIS meeting on October 7, 2005. PRSOF, ¶ 25.

In regard to a second trip to Clarion in 2005, Defendants state that Ms. Dohner reported that she traveled to Erie for client treatment at the Clarion Psychiatric Center, but that there are no records that she signed into that facility on the relevant date. DSOF, ¶¶ 26-27. According to Ms.

Dohner, she took that trip to the Clarion Psychiatric Center to sign in a client for treatment and was not required to sign in herself. PRSOF, ¶¶ 26-27. Moreover, according to Defendants, Ms. Dohner sought reimbursement for a trip to the Sarah Reed Center in Erie, Pennsylvania in December 2004 and January 2005. DSOF, ¶ 28. According to Defendants, "the Sarah Reed Center indicated that the only visit would have been for Treatment Team meetings and that there were not such meetings conducted on either the December of January date." DSOF, ¶ 29. However, Ms. Dohner disputes this, stating that she went to the Sarah Reed Center in December 2004 to deliver Christmas presents. Furthermore, she states, she was not questioned at any point about the January 2005 trip. PRSOF, ¶¶ 28-29.

According to Mr. Read, in 2005 and 2006, he began to question Ms. Dohner's mileage reimbursements. DSOF, Ex. H, p. 56:1-16. Mr. Read testified that the amount of mileage Ms. Dohner reported on her expense mileage report for trips to Pittsburgh for a hearing was "sufficient to raise a question" about the accuracy of Ms. Dohner's expense reports, as the amount appeared to be high. DSOF, Ex. H, p. 67:13-17. This allegedly questionable report indicates that Ms. Dohner traveled 275 miles for a matter in Pittsburgh. DSOF, Ex. H, p. 68:18-21. Additionally, Mr. Read testified that he followed up on an expense mileage report to Pittsburgh after one of the reports appeared high; he hoped to find out if Ms. Dohner had actually attended a hearing in the "George" matter in February 2006, because he suspected that she did not attend that hearing. DSOF, Ex. H, p. 63: 1-6. According to Mr. Read, he determined that Ms. Dohner did not attend the hearing; upon discussing the issue with Ms. Dohner, she explained that she filled out her expense sheet in advance, but was unable to attend the hearing, and forgot to take the trip off the report. DSOF, Ex. H, 64:1-6. According to Ms. Dohner, she initially submitted an expense report for a trip to Pittsburgh for the

"George" hearing, but the hearing was cancelled. PSOF, ¶ 82. Further, Ms. Dohner states that she called the Controller's Office and requested that the mileage request be removed from the expense report. *Id.* According to Ms. Dohner, the Controller's office informed her that the requested reimbursement would be removed. PSOF, ¶ 83.

According to Defendants, Ms. Dohner represented on a January 2006 expense report that she attended a January 19, 2006 conference in Harrisburg that she did not, in fact, attend. DSOF, ¶¶ 32-33. According to Ms. Dohner, she traveled to Harrisburg in early 2006 to meet with other Children and Youth administrators during a CYS conference. PSOF, ¶ 86. Ms. Dohner states that she informed the County Commissioners that she went to Harrisburg but did not attend the actual conference; rather, she went to meet with other administrators to discuss civil service issues. PSOF, ¶ 87. Additionally, the parties dispute whether Ms. Dohner's husband attended this trip with her. DSOF, ¶ 34; PRSOF, ¶ 34. Ms. Dohner states that, "after the fourth time the commissioners questioned [her] about mileage . . . she told them that her husband went with her because she thought they would quit badgering her if they heard her husband went." PRSOF, ¶ 34. According to Defendants, "Plaintiff admitted to lying to the Commissioners about her husband attending the Harrisburg conference with her because she felt that it was better to lie to [them] than to tell them the truth." DSOF, ¶ 34.

Defendants state that Ms. Dohner was fired for submitting falsified expense reports: mileage requests for trips that she never took or that were not business related. DSOF, ¶ 42. However, Ms. Dohner claims that she was never reimbursed for any mileage that she did not actually drive for CYS related activities. PSOF, Ex. 1, ¶ 7.

Jeans Money

7

At the CYS office, personnel could donate money to charity and, in return, were allowed to wear jeans to the office. DSOF, ¶ 15; PRSOF, ¶ 15. The money, referred to as "Jeans Money", was collected by Bonnie Baughman, a secretary at CYS. DSOF, ¶ 16; PRSOF, ¶ 16. According to Defendants, Bonnie Baughman gave the money to Ms. Dohner for distribution. DSOF, ¶16. However, Ms. Dohner testified that Bonnie Baughman was responsible for mailing the money to the charities, once it was collected. PRSOF, ¶ 16. In November of 2005, CYS caseworkers Autumn Bloom and Tonia Weitosh approached Mr. McCracken with concerns about the distribution of the Jeans Money to charitable organizations. DSOF, ¶15; PRSOF, ¶ 15. Mr. McCracken thereafter contacted the Clearfield Chapter of the American Red Cross, the Central Pennsylvania Community Action and the American Cancer Society about any CYS donations. DSOF, ¶ 17; PRSOF, ¶ 17. All three of these organizations confirmed that no one at CYS had ever made any of these donations. DSOF, ¶ 18; PRSOF, ¶ 18. Mr. McCracken thereafter asked Ms. Dohner to produce copies of thank you letters allegedly received from the organizations purportedly receiving donated money. DSOF, ¶ 19; PRSOF, ¶ 19. According to Defendants, "Plaintiff provided copies of thank-you cards, which were nothing like the examples provided by Red Cross and Community Action." DSOF, ¶ 20. Mr. McCracken prepared a summary of the investigation related to the Jeans Money. DSOF, ¶ 21; PRSOF, ¶ 21.

Investigations of Plaintiff

According to Ms. Dohner, in early February 2006, Frederick Ammerman, President Judge of the Clearfield County Court of Common Pleas, conducted an investigation of the CYS office. PSOF, ¶ 30. Judge Ammerman testified that he approached the County Commissioners about conducting interviews and they said "ok." PSOF, ¶ 31; DRSOF, ¶ 31. Judge Ammerman testified:

> I knew that they [the Commissioners] were in charge of Children and Youth to speak as county commissioners and I felt that there might really be some kind of problem out there. I felt that the commissioners needed to deal with it by getting the information that they needed to appropriate look at the situation. So I felt well, you know, maybe the thing to do is to go out and start interviewing some of the people that work out there and try to get to the bottom of what the problem is, if there is a problem. So I think I walked into the commissioners' office, it would have been maybe a day or two before February 7th of '06 and said hey, you know, we're hearing about all of these problems out at Children and youth. I think the thing to do is I've got some free time, let's go out and do interview. And Mr. Reed [sic] and Mr. McCracken said okay, so we did.

PSOF, Ex. 2, p. 34:13-25, 35:1-11. However, according to Mr. McCracken, Judge Ammerman never asked, but told Mr. Read that he was going to investigate Ms. Dohner. PSOF, ¶ 32; DRSOF, ¶ 32. Judge Ammerman testified at his deposition that he does not supervise CYS, and that he did not handle many CYS cases while Ms. Dohner was administrator. PSOF, ¶ 33; DRSOF, ¶ 33. During his investigation of Ms. Dohner, Judge Ammerman interviewed employees at CYS. According to Ms. Dohner, he did so by "showing up at the office of CYS, and inquiring about negative aspects of [Ms. Dohner's] management style." PSOF, ¶ 34. According to Defendants, Judge Ammerman talked "generally about the CYS office and 'how things [were] running.'" DRSOF, ¶ 34 (quoting DSOF, Ex. G, pp. 53-54)).

Judge Ammerman also interviewed Judge Cherry, who handled most of the CYS cases in the Court of Common Pleas of Clearfield County. PSOF, ¶36; DRSOF, ¶ 6. Judge Cherry testified at his deposition that Ms. Dohner was "top notch" and handled her duties well. PSOF, ¶ 37; DRSOF, ¶ 36. Additionally, he testified that there were no problems with Ms. Dohner in court proceedings, or in her supervision of CYS at least as would potentially show up in court proceedings. *Id.* Moreover, according to Judge Cherry's deposition testimony, he did not believe CYS was in any

9

turmoil in 2006; also, he did not believe that the agency was chaotic. PSOF, ¶ 38; DRSOF, ¶ 38.

At his deposition, Michael Lytle, the third County Commissioner during Ms. Dohner's tenure as Director of CYS, testified that he believed that Judge Ammerman's investigation of Ms. Dohner was a "setup." PSOF, ¶ 42; DRSOF, ¶ 42. Additionally, Mr. Read testified that Commissioner Lytle felt that investigations of departments heads were a "witch hunt." PSOF, ¶ 43; DRSOF, ¶ 43. Mr. Read testified in his deposition that Judge Ammerman's investigation of Ms. Dohner was not the basis for terminating Ms. Dohner's employment; furthermore, Mr. Read stated that Judge Ammerman did not offer an opinion on terminating Ms. Dohner's employment. PSOF, ¶¶ 46-47; DRSOF, ¶¶ 46-47. However, Judge Ammerman testified that he informed Defendants Read and McCracken that Ms. Dohner should be fired. PSOF, ¶ 48; DRSOF, ¶ 48.

Plaintiff's Allegations of Discrimination

Ms. Dohner testified at her deposition that after a meeting regarding Ms. Dohner's handling of a caseworker, Mr. Read informed Ms. Dohner that a man would do a better job in her position. PSOF, Ex. 2, p. 220: 9-25. Specifically, Ms. Dohner testified:

> Q. Why did you think [Mr. Read] didn't like you because you were female?
> A. Because he made the comment to me that a man would be better in that job.
> Q. When did he say that?
> A. During one of our meetings that he met with me afterwards, to question me about Michelle Dotts' time.
> Q. When did that meeting occur?
> A. Sometime in '05.
> Q. Are you saying that it was a meeting just between you and [Mr. Read]?
> A. There was a meeting that I attended with the commissioner, and then following that meeting, he said, I want to talk to you. So year, it was just him [sic] and I.
> Q. Tell me about that meeting. Where did that occur?
> A. In the conference room of the commissioners' office.
> Q. And tell me about the conversation between you and [Mr. Read].

> A.    I told him that I wasn't letting Michelle do what they were saying I was letting her do, and he said, "I don't believe you, you're lying to me," and I said, I'm not, I'm telling you what —"I'm telling you the truth," and I said, "What is it that you don't like about what I'm doing?" And he never came up with a, you know, you're doing this wrong, you're doing this wrong, he just said — I said, "You don't want me in that position," and he said, "I think a man would do a better job, he would shake things up with all these women."

PSOF, Ex. 2, pp. 220:17-25; 221: 1-24; 222:1-3.

Ms. Dohner testified that shortly thereafter, she submitted a memo to the county commissioners alleging that she was being discriminated against based on her gender. PSOF, Ex. 2, p. 222: 10-25.  Specifically, Ms. Dohner avers that she hand-delivered the memo to the commissioners' secretary on that date. *Id.* at 20-21. At her deposition, Ms. Dohner testified:

> A.    I believe I wrote a memo immediately following, sometime thereafter.
> Q.    Who did you write the memo to?
> A.    Commissioner.
> Q.    And what did you say in the memo, to the best of your recollection?
> A.    I believe that I was being harassed, because of my gender.
> Q.    Did you give that memo to the commissioner?
> A.    I gave that memo to the secretary in the commissioners' office.
> Q.    When?
> A.    Probably the day I wrote it, or the day after I wrote it.
> Q.    And when was that?
> A.    I'm not sure of the exact date. It was some time after the meeting we had. ...
> A.    Sometime in '05....
> A.    .... Let me just rephrase that. In '05, I wrote them a letter asking if I could meet with them.
> Q.    And you wrote that to all the commissioners?
> A.    Yes. And the actual letters that I wrote about the harassment were in February or March of '06, maybe, January. I actually wrote one that I didn't give to tehm because I was— I don't know, probably intimidated.
> Q.    Is one of the three that you just described one that you wrote but didn't give them?
> A.    One of them is, yes.
> Q.    Which one?
> A.    It would have been the one that I asked for a meeting to discuss why

11

> he felt that a man would do a better job. ...

PSOF, Ex. 1, p. 223:7-25. A copy of a memo addressed to Clearfield County from Ms. Dohner,

dated February 20, 2006, states:

> I am writing this letter to try and set up a meeting with the three of
> you to discuss why I am constantly being threatened with termination.
> I have been told by Mr. Read that he feels a man could do a better job
> than me and I feel this has nothing to do with my work performance
> but rather that I am a female and he feels that a man could shake
> things up. He has indicated this to me on a few occasions. Mr. Read
> has threatened me with termination at least weekly for quite some
> time now and also refers back to a man could do better and it has
> become quite obvious that is because I am a female. So could we
> please schedule to meet sometime soon to discuss this further.

PSOF, Ex. 6. Defendants deny that this memo was ever received by the commissioners or that Ms.

Dohner raised the issue of gender discrimination prior to any meetings in March, 2006. DRSOF, ¶

15. Mr. McCracken testified that he recalled Ms. Dohner submitting this memo after the meeting

of the commissioners on March 16, but at some point before March 23, when he made the

determination to fire Ms. Dohner. PSOF, Ex. 8, pp. 62-63.

Defendants admit that Ms. Dohner raised the issue of gender discrimination at a meeting of

the commissioners in March 2006. PSOF, ¶ 20; DRSOF, ¶ 20. Specifically, Mr. Read testified:

> Q.    . . . When was it that [Plaintiff] raised the issue of gender
>       discrimination to you or you colleagues?
> A.    I believe that that was raised at the March 20 [2006]
>       conversations. I believe that that was when she said
>       something to the effect of, you know, a man could do this
>       better or something to that –
> Q.    Wait, you mean [Plaintiff] told you a man could do this job
>       better, or she said you said that?
> A.    That was what she was alleging.
> Q.    Oh, okay. She alleged that you said that at the March 20
>       meeting?
> A.    I believe that is correct, yes.

12

PSOF, Ex. 4, p. 171: 1-12. Mr. McCracken testified that Ms. Dohner raised an issue of gender

discrimination at a March 16 meeting of the commissioners:

> Q.  Did [Ms.] Dohner raise ongoing complaints about [Defendant] Read at the 16th of March meeting?
>
> A.  Yes.
>
> Q.  She says in her memo, for example– she says that 'Read has said it many times, not only to me but to others, that he does not want me in this position and has indicated that a man would be better suited for the job.'
> Did [Plaintiff] say that at the 16th meeting to you at all?
>
> A.  There was a heated exchange between the — between [Plaintiff] and [Defendant] Read that she said that. ...
>
> A.  The heated exchange between [Plaintiff] and [Defendant] Read, she made the statement, my recollection is, 'just admit it REx. You think a man would do a better job than me.' ....

PSOF, Ex. 8, p. 78: 21-25; p. 79:1-12. Mr. McCracken testified that by March 23, 2006, he and Mr.

Read had made the decision to fire Ms. Dohner. PSOF, ¶ 22; DRSOF, ¶ 22.

Termination of Plaintiff's Employment

Ms. Dohner was fired from her position on March 28, 2006. PSOF, ¶ 23; DRSOF, ¶ 23.

According to Ms. Dohner's deposition testimony, Mr. Read met with Ms. Dohner on the morning

of March 28, 2006, in her office. PSOF, Ex. 2, p. 289. Marianne Sankey was present during this

meeting. *Id.* at 290:24-25. Ms. Dohner testified that at this meeting, Mr. Read demanded her

resignation:

> A. . . . [Mr. Read] said "We'll cut to the chase. I want yo ur resignation." And I said, "No. I didn't do anything wrong. I'm not resigning." And he said, "Then you're terminated." I said, "Can you tell me why," and he said, "You know why, I don't like you and I don't want you here." And I said, "Can I have that in writing?" And he said 'No.'

PSOF, Ex. 2, p. 289:13-25. Mr. Read testified at his deposition that the vote to formally discharge

Ms. Dohner was taken at a commissioners' meeting on April 4, 2006. PSOF, Ex. 4, pp. 22-25; 208:1-

2. However, he also testified that he fired Ms. Dohner on March 28, after both Mr. McCracken and

he determined firing was appropriate. PSOF, Ex. 4, p. 196. Mr. Read further testified that

Commissioner Lytle did not agree with the decision to fire Ms. Dohner. *Id.*

Aftermath of Plaintiff's Termination

The same day that Defendants fired Ms. Dohner, Mr. Read testified that he called the district

attorney in Clearfield County, and later sent the district attorney a letter stating that he believed that

Ms. Dohner misappropriated county funds. PSOF, Ex. 4, pp. 206-207. Mr. Read's discussions with

the district attorney led to an investigation of Ms. Dohner for embezzlement of county funds. PSOF,

¶ 97; DRSOF, ¶ 97. According to Ms. Dohner, she met with two different Pennsylvania state police

officers in June, 2006 and October, 2007 concerning the jeans money and mileage reports. PSOF,

¶ 98. Ms. Dohner states that she was never indicted or charged with any crime and that the

investigation was dropped. PSOF, ¶ 101. Defendants deny this, averring that the criminal

investigation of Ms. Dohner is open and ongoing. DSOF, ¶ 101.

Ms. Dohner states that after her discharge, she sought treatment from a psychiatrist every two

weeks for a year and four months. PSOF, ¶ 105. The psychiatrist prescribed Wellbutrin for Ms.

Dohner, after finding that she showed symptoms of depression and anxiety. PSOF, ¶ 106. After the

termination of her employment, Ms. Dohner claims that she experienced a variety of symptoms,

including problematic sleeping and eating, crying regularly, restlessness, muscle tension, fatigue,

difficulty concentrating, acting short-tempered and on edge, and feeling sad and withdrawn. PSOF,

¶ 107. Additionally, according to Ms. Dohner, her reputation in the community was damaged as a

result of the investigations for theft. PSOF, ¶ 15. Ms. Dohner testified that people told her that she

would not work in Clearfield County again; furthermore, she also claims that she was told that one

14

reason she failed to receive an interview for a position at Clearfield Hospital was the investigation by law enforcement for embezzlement. PSOF, ¶¶ 115-119.

Mr. Read admitted that he participated both in the decision to fire Ms. Dohner and the decision to hire her replacement. PSOF, ¶ 64; DRSOF, ¶ 64. Ms. Dohner testified that after her employment was terminated, Mr. Read continued to say that he was looking for a man to fill her position; Defendants deny this. PSOF, ¶ 56; DRSOF, ¶ 56. · In 2007, the County replaced Ms. Dohner with a male, Francis Kuhn, at an annual salary of $50,000. PSOF, ¶ 57; DRSOF, ¶ 57. According to Defendants, prior to becoming Director of Clearfield County CYS, Mr. Kuhn was previously the Director of Children and Youth in McKean County and also worked for Children and Youth in Elk County. Also, Mr. Kuhn holds a master's degree. DRSOF, ¶ 57. In the time since Mr. Kuhn became Director, CYS received three provisional licenses from the Pennsylvania Department of Public Welfare. PSOF, ¶ 61; DRSOF, ¶ 61. Susan Duty testified at her deposition that if CYS receives one more provisional license, the state will come in and run the agency. PSOF, ¶ 62; DRSOF, ¶ 62. CYS did not receive any provisional licenses while Ms. Dohner was Director. PSOF, ¶ 63; DRSOF, ¶ 63. However, according to Defendants, CYS was investigated by the Department of Public Welfare during Ms. Dohner's tenure as Director, and was found to be non-compliant in various areas. DRSOF, ¶ 63. In his deposition, Mr. Read testified that the infighting that occurred under Ms. Dohner continues to take place under Mr. Kuhn. PSOF, ¶ 66; DSOF, ¶ 66. Additionally, Susan Dutry testified that employees continue to come in late and to take long lunches. *Id.*

Defendant County's Gender Discrimination Policy

Clearfield County issues a Personnel Policies and Procedures manual to its employees. PSOF, Ex. 9. The first page of the policy states as follows:

15

POLICY

Clearfield Count recognizes that employment service depends on utilizing all our human resources to their fullest capabilities. In order to reach this potential, equal employment policies and procedures must be met. Therefore, it is the policy of Clearfield County to comply with all federal, state and local laws and regulations. The County Commissioners and Management of Clearfield County believe in the principles of equal opportunity for all in regard to all areas of personnel, including, but not limited to recruitment, selection, placement, promotion, demotion, layoff, compensation, training and terminations.

Clearfield County employs without regard to race, color, religious creed, physical or mental handicap, national origin, age, sex, disabled veterands or other non-job-related factors. It is also our policy to give appropriate attention to areas such as educational background, training and experience and other factors as specified in the job requirements outlined for the specific jobs.

*Id.* The policy also outlines communication procedures of equal employment opportunity polices.

*Id.*

### III.   Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate "if the pleadings, the discovery and disclosure of material on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a summary judgment motion, the court must 'view the evidence . . . through the prism of the substantive evidentiary burden" to determine "whether a jury could reasonably find either that the plaintiff proved [her] case by the quality and quantity of evidence required by the governing law or that [she] did not." *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).

When the non-moving party will bear the burden of proof at trial, the moving party's burden

16

can be "discharged by 'showing'–that is, point out to the District Court–that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party carries this burden, then the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *see also Petruzzi's IGA Supermarkets, Inc. v. Darling Delaware Co.*, 998 F.3d 1224, 1230 (3d Cir. 1993). Thus, the non-moving party cannot rest on the pleadings, but instead must go beyond the pleadings and present "specific facts showing that there is a genuine issue of fact for trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.2d 639, 643 n. 3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)).

Additionally, in considering a motion for summary judgment, a district court may not "make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in [their] favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Doe v. County of Centre*, 242 F.3d 437, 446 (3d Cir. 2001) (holding that "a court must take the facts in the light most favorable to the nonmoving party, the [plaintiff], and draw all reasonable inferences in their favor.") (citation omitted).

## IV.    Discussion

Defendants raise several arguments in support of their Motion for Summary Judgment. Specifically, Defendants contend that each of Ms. Dohner's claims fail as a matter of law. Defendants assert the following rationales in support of their argument: (1) Ms. Dohner has failed

to establish a prima facie case of discrimination and retaliation under Title VII of the Civil Rights Act; (2) Ms. Dohner has failed to establish a prima facie cause under either the Equal Protection Clause of the 14th Amendment of the Constitution of the United States or the First Amendment of the Constitution of the United States; and (3) even assuming Ms. Dohner could establish a prima facie case, she was fired for legitimate non-discriminatory reasons. Doc. No. 25, p. 2. Moreover, Defendants argue that Ms. Dohner is not entitled to damages for emotional distress, and that she is not entitled to punitive damages for her claims. *Id.* at 32-35.

## A. Plaintiff's Sexual Harassment Claim

Defendants first argue that they are entitled to judgment as a matter of law as to Ms. Dohner's sex discrimination claim under Title VII. Doc. No. 25, p. 3. Specifically, Defendants contend that (1) Plaintiff has failed to provide any direct evidence of gender discrimination; (2) Plaintiff cannot establish a prima facie case of gender discrimination under the *McDonnell-Douglas* burden shifting framework; (3) Plaintiff was fired for a legitimate non-discriminatory reason; and (4) Plaintiff has failed to produce sufficient evidence to show that said legitimate non-discriminatory reasons were pretextual. Doc. No. 24, pp. 4-18. For the reasons that follow, the Court disagrees with Defendants' arguments.

### 1. Plaintiff Establishes a Gender Discrimination Claim Under a Mixed Motive Theory

Defendants argue that under a mixed-motive analysis, Ms. Dohner does not provide any direct evidence of discrimination. Doc. No. 25, pp. 3-4. Specifically, Defendants argue that the record is "clear" that Mr. Read did not threaten Ms. Dohner with firing, or state that a man could perform a better job than she could, as she alleges, and thus she fails to produce direct evidence of

18

discrimination as required under a Title VII mixed-motive theory. *Id.* at 4.

In response to Defendants' arguments, Ms. Dohner argues that she offers sufficient direct evidence of discrimination, insofar as she provides evidence that Mr. Read stated several times, in front of Ms. Dohner and/or Susan Dutry, that he wanted a man in Ms. Dohner's position. Doc. No. 31, p. 6. Moreover, Ms. Dohner argues that Mr. Read was a decision-maker both in the decision to fire her, and the subsequent decision to hire a man, Francis Kuhn, in her place. *Id.* Therefore, Ms. Dohner concludes, a jury could reasonably infer that gender was a motivating factor in Defendants' decision to discharge Ms. Dohner. *Id.*

Under the Civil Rights Act, a plaintiff may establish an unlawful employment practice under the so-called "mixed motive" analysis by demonstrating that "race, color, religion, sex or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m); *see Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). In a mixed-motive case, "the plaintiff has the burden of showing by evidence tied to a discriminatory animus that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 522 (3d Cir. 1992) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268, n. 12 (1989); 42 U.S.C. §2000e-2(m), as amended)). Under a mixed-motive theory, a plaintiff may shift the evidentiary burden "by producing direct evidence of discrimination." *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998) (citing *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513-14 (3d Cir. 1997), *cert. denied*, 523 U.S. 1074 (1998)). Once a plaintiff "proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have

19

made the same decision even if it had not taken the plaintiff's gender into account." *Price Waterhouse*, 490 U.S. at 258; *see also Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 n. 4 (3d Cir. 1995) ("In short, direct proof of discriminatory animus leaves the employer only an affirmative defense on the question of 'but for' cause or cause in fact.").

In order to proceed under a mixed-motive case, a plaintiff must offer evidence "such that it demonstrates that the decision makers placed substantial negative reliance on an illegitimate criterion in reaching their decision.'" *Id.* (quoting *Walden*, 126 F.3d at 513) (quotations omitted). "In other words, the evidence must reveal a sufficient discriminatory animus making it unnecessary to rely on any presumption from the prima facie case to shift the burden of production." *Riding v. Kaufmann's Dept. Store*, 220 F. Supp. 2d 442, 448 (W.D. Pa. 2002). A plaintiff may satisfy her burden through evidence of "'conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Starceski*, 54 F.3d at 1096 (quoting *Miller v. Cigna Corp.*, 47 F.3d 586 (3d Cir. 1995) (en banc)).[1]

Here, Mr. Read admitted at his deposition that he was a decision maker both in the decision

---

[1] The Court notes that Defendants argue that Ms. Dohner is unable to establish a claim under a mixed-motive theory under Title VII because she has failed to adduce direct evidence. However, the Supreme Court held that direct evidence is not a requirement to proceed under a mixed-motive theory at summary judgment. *Desert Palace v. Costa*, 539 U.S. 90, 92, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). Prior to the Supreme Court's ruling in *Desert Palace*, a plaintiff proceeding under the mixed-motive theory was required to present direct evidence of discrimination. *See Watson v. Se. Penn. Transp. Auth.*, 207 F.3d 207, 217-20 (3d Cir. 2000). However, in *Desert Palace*, the Supreme Court held that direct evidence is not necessarily required to proceed under a mix-motive theory under Title VII. *Desert Palace v. Costa*, 539 U.S. 90, 92, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). As a result, a plaintiff who has presented certain sufficient circumstantial evidence of gender discrimination may at least choose to proceed under *either* the mixed-motive theory set forth originally in *Price Waterhouse* or the burden shifting framework set forth in *McDonnell Douglas. See Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008). *See Stager v. Beverly Health and Rehab. Servs., Inc.*, Civil Action No. 06-101, 2008 WL 3165837, at *5 (W.D. Pa. Aug. 6, 2008). Because the Court here determines that Ms. Dohner offers direct evidence of discrimination, we need not discuss whether Ms. Dohner also offers circumstantial evidence sufficient to proceed under a mixed-motive theory. However, as we will discuss *infra*, Ms. Dohner produces sufficient circumstantial evidence of discrimination, such that a reasonable jury could infer pretext.

to fire Ms. Dohner and to hire a male individual in her place. PSOF, ¶ 64; Def.'s Response to DSOF, ¶ 64. Additionally, Ms. Dohner offers evidence that Mr. Read told Susan Dutry and her that he wanted a man in Ms. Dohner's position. Specifically, Susan Dutry testified that "it was well known that [Mr.] Read wanted a man in the position." PSOF, Ex. 5, p. 99: 23-24. Ms. Dutry testified that in February, 2006, she was present at a meeting where Mr. Read stated that he believed that a man would be better in the position of CYS supervisor. PSOF, Ex. 5, p. 11:1-25. Additionally, Ms. Dutry also testified that, in April or May 2006 after Ms. Dohner 's firing, Mr. Read indicated that he was looking for male candidates to fill Ms. Dohner's position. PSOF, Ex. 5, p. 13:1-25. Ms. Dohner testified that she was directly told by Mr. Read, after a meeting of the commissioners, that he believed a man would do a better job in her position. PSOF, Ex. 1, p. 220: 17-25; 221:1-24. Ms. Dohner testified that in late 2005 or early 2006, Mr. Read stated: "I think a man would do a better job, he would shake things up with these women." PSOF, Ex. 2, p. 22:1-3. Ms. Dohner testified that shortly thereafter, in March 2006, she was fired from her position at CYS and replaced with a man. PSOF, Ex. 1, pp. 220-21.

While Defendants argue that Ms. Dohner's deposition testimony is not sufficient direct evidence of discriminatory aminus, "there is no rule of law that the testimony of a discrimination plaintiff, standing along, can never make out a case of discrimination that could withstand a summary judgment motion." *Weldon*, 896 F.2d 793, 800 (citing *Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987), cert. denied, 484 U.S. 1020 (1988)). Indeed, in this case, Ms. Dohner's testimony that Mr. Read, a decision-maker in her firing, made a comment directly related to her ability to maintain her position because she is female; such is sufficient direct evidence of discrimination to withstand summary judgment under a mixed-motive theory. *See. e.g., Sapko v.*

21

*Ringgold Area Sch. Dist.*, Civil Action No. 06-893 , 2008 WL 2367321, at \*6 (W.D. Pa. June 10, 2008) (holding that the plaintiff had offered sufficient direct evidence of discriminatory animus, such that age was "at least part of the reason for the employment decision", where the decisionmaker admitted that he believed that a younger individual would be "better or more qualified than their older counterparts.").

Moreover, the Court may not make credibility determinations at this stage of the proceedings. *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255. Rather, Ms. Dohner's testimony, with respect to Mr. Read's statements concerning a man as preferable in the director's position, raises a genuine issue of material fact as to whether such statements were made; the credibility and/or import of Ms. Dohner's testimony is a determination for the jury. *Id.*

Additionally, the Court agrees with Ms. Dohner that summary judgment is precluded on the issue of whether Defendants would have fired her absent any improper motive, as Defendants do not address the issue, but merely argue that Ms. Dohner fails to produce direct evidence. Therefore, because the Court finds that Ms. Dohner sufficiently produces direct evidence of discrimination, and because genuine issues of material fact remain as to whether her gender was a motivating factor in the termination of her employment, Defendants' motion for summary judgment must be denied.

> 2.      *Plaintiff Establishes a Case of Gender Discrimination Under a Pretext Analysis*

In their Motion for Summary Judgment, Defendants also argue that Ms. Dohner fails to establish a claim under Title VII under the *McDonnell Douglas* burden shifting analysis. Doc. No. 25, pp. 5-18. Specifically, Defendant argues that Ms. Dohner fails to establish a prima facie case

of gender discrimination, insofar as she fails to establish that both (1) she was qualified for the

position from which she was fired; and (2) similarly situated employees were not treated more

favorably than she. Moreover, Defendants argue that, even assuming Ms. Dohner could establish

a prima facie case, the Defendants nonetheless had legitimate, non-discriminatory reasons for firing

Ms. Dohner, who fails to provide evidence that said reasons were pretextual. Doc. No. 25, pp. 10-18.

In response to Defendants' arguments, Ms. Dohner contends that she establishes a prima facie case

of gender discrimination under Title VII because she offers sufficient evidence of pretext. Doc. No.

31, pp. 11-19.

A plaintiff offering indirect evidence of discrimination may proceed under the framework

outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668

(1973); *see Ezold*, 983 F.2d at 522 (citing *McDonnell Douglas*, 411 U.S. at 802; *Texas Dept. of*

*Comm. Affairs v. Burdine*, 450 U.S. 248, 252-56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981));

*Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 351 (3d Cir. 1999)). At the outset of this

analysis, a plaintiff is required to establish a prima facie case of gender discrimination under Title

VII by a preponderance of the evidence. *Ezold*, 983 F.2d at 522.

The Third Circuit held that, in order to establish a prima facie case of gender discrimination,

a plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she was qualified

for the position from which she was discharged; (3) that she was discharged; and (4) that individuals

outside the protected class were treated more favorably. *See id.* (citing *Roebuck v. Drexel Univ.*, 852

F.2d 715, 726 (3d Cir. 1988)). However, the Third Circuit also held that "the requirements of a

prima facie case are flexible, and in particular that 'the fourth element must be relaxed in certain

circumstances . . . .'" *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 257 (3d Cir. 1999) (quoting

*Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994)). Indeed, the *McDonnell Douglas* analysis was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir. 1990) (citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)).

This analysis requires a plaintiff to carry the initial burden of offering evidence adequate to create an inference of discrimination. *Id.* (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)). A plaintiff may fulfill the fourth element of a prima facie case by showing that the position was ultimately filled by an individual outside the protected class, *see Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1066 n. 5 (3d Cir. 1996), or by showing that similarly situated individuals outside the protected class were treated more favorably. *See Ezold*, 983 F.2d at 522. However, the Third Circuit also held that the presentment of the fourth element is not an absolute requirement for establishing a prima facie case. *See Pivirotto*, 191 F.3d at 356-57.

In this case, it is undisputed that Ms. Dohner was replaced by an individual outside her protected class, *i.e.*, a male. PSOF, ¶ 57; DRSOF, ¶ 57. Therefore, the Court finds no merit in Defendants' argument that Ms. Dohner fails to meet the fourth element of a prima face case of gender discrimination.

Moreover, the Court also finds that Ms. Dohner properly presents sufficient evidence regarding the first prong, that she was qualified for the position. Defendants specifically argue that Ms. Dohner fails to show that she is qualified for the position from which she was fired, because, according to Defendants, she was not meeting their expectations for performance of her job

responsibilities. Doc. No. 25, p. 5. In support of this position, Defendants cite to a district court case, *Carver v. D.C.I. Chippewa Clinic*, No. 05-0122, 2006 WL 2927628, at *6 (W.D. Pa. Oct. 12, 2006). However, *Carver* does not support Defendants' position. In *Carver*, the defendant tried to argue that the plaintiff was not qualified for her position because of her interpersonal conflicts with co-workers and patients, stating that the existence of such conflicts was contrary to legitimate job expectations. *Id.* at *6. *Carver* held that although there was an implicit expectation that the plaintiff should interact civilly with staff and patients, "the argument that the periodic need to discipline her for her outbursts made her 'not qualified' for her job as a whole fails under controlling law." *Id.* (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 289, 298 n. 13 (3d Cir. 2003).

Indeed, it is axiomatic in the case law of the Third Circuit that in order to be considered "qualified" for purposes of a prima facie case of gender discrimination, a plaintiff is only required to show that she possessed the objective qualifications for the position at the time of the termination of her employment. *Weldon*, 895 F.2d at 798("[T]o deny the plaintiff an opportunity to move beyond the initial stage of establishing a prima facie case because he has failed to introduce evidence showing he possess certain *subjective* qualities that would improperly prevent the court from examining the criteria to determine whether their use was mere pretext") (emphasis added) (citing *Fowle v. C&C Cola*, 868 F.2d 59, 65 (3d Cir. 1989). *Cf. Hugh v. Butler County YMCA*, 418 F.3d 265, 268 (3d Cir. 2006). Moreover, "satisfactory performance of duties, leading to a promotion, does establish a plaintiff's qualification for a job." *Hugh*, 418 F.3d at 268 (*Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir. 1989)).

Here, Defendants articulate several putative reasons as to why Ms. Dohner was not qualified for the position of CYS Director; these reasons include as follows: (1) that Judge Ammerman

believed Ms. Dohner lacked the personality and skills for the job; (2) that there were problems in the management of CYS beginning in 2004; (3) that Mr. Read believed Ms. Dohner was turning in inaccurate expense reports; and (4) that complaints were received about CYS by the Department of Public Welfare and from parents.

As stated, though, Defendants' issues with Ms. Dohner's management style and personality are subjective rather than objective qualifications. Indeed, Defendants do not dispute that Ms. Dohner possessed the requisite education or experience for the job, and such can be inferred from Defendants' hiring of Ms. Dohner as acting direction and then director.

Because Ms. Dohner establishes a *prima facie* case of gender discrimination, the burden of production shifts to Defendants to offer legitimate, non-discriminatory reasons for her discharge. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993) (holding that "the *McDonnell Douglas* presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case- i.e., the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'") (quoting *Burdine*, 450 U.S. at 254); *Kay Jewelers*, 142 F.3d at 644 n. 5; and *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999) (quoting *Burdine*, 450 U.S. at 252-53) (noting that, "while the burden of production may shift, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"). A defendant may satisfy this burden by "introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Id.* While a defendant's burden at this stage is "relatively light," *Fuentes*, 32 F.3d at 763, it is nonetheless required to "'clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The

explanation provided must be legally sufficient to justify a judgment for the defendant.'" *Ezold*, 983 F.2d at 523 (quoting *Burdine*, 450 U.S. at 255-56). Indeed, a defendant is required to offer clear and specific reasons for a plaintiff's firing in order to permit the plaintiff a fair opportunity to rebut said reason with facts of record. *Burdine*, 450 U.S. at 256.

Here, Defendants proffer the following reasons for Ms. Dohner's firing: (1) poor job performance; (2) poor management of the CYS office; (3) sexual harassment complaints against Plaintiff; (4) inappropriate behavior; and (5) issues with mileage reimbursement and improper use of the Jeans money. Doc. No. 37, p. 9. The Court finds that, if taken as true, evidence proffered that Ms. Dohner was not performing well and that she turned in false expense reports and/or improperly use the Jeans money is enough to establish a legitimate, non-discriminatory reason for Defendant's termination of Ms. Dohner's employment. As such, for purposes of the summary judgment analysis, Defendants meet their burden at this stage, and the burden of production now shifts back to Ms. Dohner to produce sufficient evidence of pretext. *Ezold*, 983 F.2d at 521.

Under *McDonnell Douglas*, once a defendant satisfies its burden of establishing a legitimate, non-discriminatory reason for the adverse employment action taken against the plaintiff, the burden shifts to the plaintiff to prove, by a preponderance of the evidence, that the legitimate non-discriminatory reasons proffered by the defendant were mere pretext for discrimination. *Jones*, 198 F.3d at 410. *See also Ezold*, 983 F.2d at 521 (citing *Burdine*, 450 U.S. at 527; *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 898 (3d Cir. 1987), *cert. denied*, 483 U.S. 1052)) (citations omitted). In order to prove pretext, a plaintiff must ultimately persuade the Court, through competent evidence, that the valid reason for the adverse employment action was, in fact, "a coverup for a . . . discriminatory decision.'" *Ezold*, 985 F.3d at 524 (quoting *McDonnell Douglas*, 411 U.S. at 805).

*See also Fuentes*, 32 F.3d at 763 (holding that, at trial, the plaintiff is required to "convince the

factfinder '*both* that the reason was false, *and* that discrimination was the real reason'") (emphasis

in original) (quoting *Hicks*, 590 U.S. at 515). A plaintiff is not required to show that discrimination

was the sole reason for the decision, but rather that the illegitimate factor was a *determinative* factor

in the adverse employment decision." *Fuentes*, 32 F.3d at 764 (emphasis in original).

In order to survive summary judgment, a plaintiff is required:

> (i) to present sufficient evidence to meaningfully throw into question,
> i.e., to cast substantial doubt upon, the [Defendants'] proffered
> reasons [for her termination] (e.g., by painting them as weak,
> implausible, contradictory, or incoherent), or (ii) to come forward
> with sufficient evidence from which a factfinder could reasonably
> conclude that an illegitimate factor more likely than not was a
> motivating or determinative cause of the adverse employment
> decision (e.g., by showing that the employer in the past had subjected
> [her] to unlawful discriminatory treatment, that the employer treated
> other, similarly situated persons not of [her] protected class more
> favorably, or that the employer has discriminated against other
> members of [her] protected class or other protected categories of
> persons.

*Fuentes*, 32 F.3d at 765. Moreover, if a plaintiff "can raise evidence sufficient to 'discredit the

[employer's] proffered reasons . . . the employee need not also come forward with additional

evidence of discrimination beyond his prima facie case' in order to survive summary judgment."

*Fasold v. Justice*, 409 F.3d 178, 185 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d at 759); *see also*

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie

case, combined with sufficient evidence to find that the employer's asserted justification is false,

may permit the trier of fact to conclude that the employer unlawfully discriminated"); and *Sheridan*,

100 F.3d at 1067 (explaining that a "plaintiff may survive summary judgment . . . if the plaintiff

produced evidence to raise a genuine issue of fact as to whether the employer's proffered reasons

were not its true reasons for the challenged employment action.").

"If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." *Fuentes*, 32 F.3d at 764 n.7. Indeed, the "rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even when the employee fails to produce evidence particular to those rationales." *Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006) (citing *Fuentes*, 32 F.3d at 764 n. 7)).

In her Brief in Opposition to Defendants' Motion for Summary Judgment, Ms. Dohner argues that she offers sufficient evidence from which a reasonable jury could infer pretext. Specifically, Ms. Dohner argues that Mr. Read's and Judge Ammerman's statements regarding their preferences for a man to take the position are evidence from which a reasonable jury could "believe an invidious discriminatory reason was more likely than not a motivating or determinative cause 'of Defendants' termination of Plaintiff.'" Doc. No. 32, p. 11 (quoting *Fuentes*, 32 F.3d at 764) (emphasis removed). Moreover, Ms. Dohner argues that she offers sufficient evidence to discredit Defendants' proffered legitimate, non-discriminatory reasons for discharging her. Doc. No. 25, pp. 11-12. In support of this argument, Ms. Dohner points to the following: (1) evidence that allegations that Plaintiff stole Jeans money and falsified expense reports were meritless and/or not actually believed by Defendants Read or McCracken, but were merely motivated themselves by Mr. Read's and Judge Ammerman's discriminatory animus; (2) evidence that Defendants attempted to hide Judge Ammerman's role in the decision to terminate Plaintiff; (3) evidence that Defendants departed from their normal procedure in permitting Judge Ammerman to be involved in the determination to terminate Plaintiff' (4) evidence that Defendants' reasons for terminating Plaintiff "have changed continuously;" and

29

(5) evidence that Defendants "set Plaintiff up to fail." *Id.*

The Court agrees that when considering this evidence in a light most favorable to Ms. Dohner, as required by our standard of review of a summary judgment motion, there is sufficient evidence from which a reasonable jury could infer that Defendants' proffered legitimate, non-discriminatory reasons were mere pretext for gender discrimination.

Additionally, the Court notes several pieces of evidence that could discredit Defendants' proffered reasons. First, as discussed above, there is an issue of fact as to whether Mr. Read, a decision maker, made statements regarding Ms. Dohner's gender that would reflect upon the rationale for his decision to terminate her employment. Reading the evidence (in particular, Ms. Dohner's testimony that Mr. Read informed her that he believed "a man would do a better job, he would shake things up with all these women," PSOF, Ex. 2, p. 222:1-3), in a light most favorable to Ms. Dohner, the Court finds sufficient evidence from which a "factfinder could reasonably believe an invidious or discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. *See also, e.g., McElhinney v. Quest Diagnostics, Inc.*, 152 F. Supp. 2d 745, 749 (E.D. Pa. 2001) (holding that evidence that the plaintiff's supervisor made comments that the plaintiff was getting too old to do her job was sufficient to permit a finder of fact to infer that discrimination was more likely than not a motivating or determinative cause of the employment action).

Furthermore, Ms. Dohner offers sufficient evidence to show "such weaknesses, implausibilities, inconsistences, incoherencies, or contradictions in the employers proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence." *Id.* (internal quotations omitted) (emphasis in original). Indeed, the record contains

sufficient evidence such that a jury could believe that Defendants' reasons "did not actually motivate" the decision to terminate Ms. Dohner's employment. *Id.* at 764.

Defendants proffer that Ms. Dohner's job performance and management of the CYS was one of the reasons for her firing. Doc. No. 37, p. 9. However, record evidence suggests the possibility that under the direction of Ms. Dohner's male replacement, the alleged problems manifested by Ms. Dohner's inability to manage the CYS office continued; nonetheless, the replacement has not been fired. *See McDonnell Douglas*, 411 U.S. at 804 (holding that evidence of favorable treatment of similarly situated individuals outside the plaintiff's protected class is evidence of pretext). Additionally, Ms. Dohner offers sufficient evidence challenging the "core facts" surrounding Defendants' purported subjective reasons for firing Ms. Dohner (*i.e.*, poor job performance, poor management and inappropriate behavior), insofar as several individuals offered testimony that the proffered reasons regarding Ms. Dohner's management abilities were not true. Specifically, Judge Cherry testified that he did not observe any problem with Ms. Dohner's management of CYS or her demeanor. PSOF, ¶ 38; DRSOF, ¶ 38. Further, Susan Dutry testified that Ms. Dohner was helpful to staff members and easily accessible. PSOF, Ex. 5, pp. 33-34. Moreover, while Defendants cite discrepancies in mileage reimbursement, and improper use of the Jeans money as reasons for the firing, Ms. Dohner offers testimony disputing the legitimacy of those allegations. In addition, former Commissioner Lytle testified that he believed that the investigation of Ms. Dohner was a "witch hunt" and that she was being "set up." PSOF, ¶¶ 46-47; DRSOF, ¶¶ 46-47. In regard to Defendants contention that Ms. Dohner was fired as a result of sexual harassment claims brought against her, Mr. Read testified that this was not a basis for the termination of employment. DSOF, Ex. H, p. 186. Coupling the above evidence with the evidence related to comments made about Ms. Dohner's

31

gender, a reasonable jury could believe that Defendants' proffered reasons were mere pretext. Thus, Ms. Dohner's claims survive summary judgment under a pretext analysis and Defendants' motion is denied on this issue.

## B. Plaintiff's Equal Protection Claims

In regard to Ms. Dohner's Equal Protection claims, Defendants argue that summary judgment is appropriate, insofar as Ms. Dohner fails to state a *prima facie* case against either Read and McCracken or Defendant County. Doc. No. 25, p. 20. In response, Ms. Dohner argues that summary judgment is precluded on her Equal Protections claims as she has offered sufficient evidence of Defendants' intent to fire her based on her gender, in violation of her right to be free from gender discrimination under §1983. Doc. No. 31, p. 26.

The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibits a state from denying "to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV. An individual asserting gender discrimination under Title VII may likewise bring a claim for violation of Equal Protection under 42 U.S.C. §1983, when her employer is a state actor. *See Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1079 (3d Cir. 1990); *King v. City of New Kensington*, No. 06-1015, 2008 WL 4492503, at *17 (W.D. Pa. Sept. 30, 2008) (noting that the Third Circuit "has recognized that a plaintiff can bring claims under Title VII and the Equal Protection Clause, provided that the claims operate from the same facts."). In order to establish a denial of Equal Protection under § 1983, like a claim for Title VII, a plaintiff is required to "prove the existence of purposeful discrimination." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990). Indeed, the same legal analysis is used to assess both employment discrimination claims brought under Title VII and Equal Protection claims brought under § 1983.

32

"Claims under Title VII and Section 1983 have the same underlying elements." *King*, 2008 WL

4492503 (also noting that the "analysis with respect to gender discrimination under Title VII . . . is

dispositive of plaintiff's gender-based discrimination claim under § 1983."). A plaintiff, in order

to prove gender discrimination, "must show that any disparate treatment was based upon her

gender." *Andrews*, 895 F.2d at 1478 (citing *Bohen v. East Chicago*, 799 F.2d 1180, 1186-87 (7th

Cir. 1986)).

Moreover, a municipality will be held liable for the conduct of its employees if a plaintiff can

show that her injury was caused by a municipal "policy" or "custom." *Bd. of County Comm'rs of*

*Bryan City v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) (citing *Monell*

*v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978)). *Brown* held:

> Locating a 'policy' ensures that a municipality is held liable only for
> those deprivations resulting from the decisions of its duly constituted
> legislative body or of those official whose acts may fairly be said to
> be those of the municipality . . . Similarly, an act performed pursuant
> to a 'custom' that has not bee formally approved by an appropriate
> decisionmaker may fairly subject a municipality to liability on the
> theory that the relevant practice is so widespread as to have the force
> of law.

*Id.* at 403-4. Additionally, *Brown* explained what is necessary to establish liability on the part of the

municipality:

> [Plaintiff must present] proof that a municipality's legislative body or
> authorized decisionmaker has intentionally deprived a plaintiff of a
> federally protected right necessarily establishes that the municipality
> acted culpably. Similarly, the conclusion that the action taken or
> directed by the municipality or its authorized decisionmaker itself
> violated federal law will also determine that the municipal action was
> the moving force behind the injury of which the plaintiff complains.

*Id.* at 405. Indeed, a single decision rendered by an official with policymaking authority can create

33

official policy, for purposes of municipal liability. *Id.* at 367-68.

In this matter, as discussed above, Ms. Dohner offers sufficient evidence of intentional discrimination, such that summary judgment is inappropriate on her Title VII discrimination claims. Likewise, said evidence is sufficient to establish a prima facie case of discrimination under § 1983 for denial of Equal Protection. Moreover, Mssrs. Read and McCracken, two of the three county commissioners, Clearfield County's top policy-making officials, made the determination to discharge Ms. Dohner. Further, Ms. Dohner produces sufficient evidence that Mr. Read may have had discriminatory animus, and may have made the decision to discharge her based on that animus. Additionally, Ms. Dohner offers evidence that her male successor was treated differently by this same individual. Thus, the relevant act of a policymaking official in this case was, in fact, the alleged denial of equal protection. *See Jones v. Indiana Area Sch. Dist.*, 397 F. Supp. 2d 628, 657 (W.D. Pa. 2005). Therefore, Ms. Dohner produces sufficient evidence of the County's liability for her discharge, in addition to the individual commissioner's liability for said actions. Thus, summary judgment is inappropriate on Ms. Dohner's equal protection claims.

## C.  Plaintiff's Title VII Retaliation Claims

Defendants argue that Ms. Dohner fails to establish a prima facie case of retaliation under Title VII, insofar as she fails to show that she engaged in protected activity; in the alternative, Defendants argue that Ms. Dohner fails to demonstrate a causal link between her engagement in protected activity and the decision to discharge her. Doc. No. 25, pp. 21-22.

In order for a plaintiff to establish a prima facie case of retaliatory discharge under Title VII, she must show (1) that she engaged in a protected activity; (2) that she was discharged subsequent to or contemporaneous with such activity; and (3) that a causal link exists between the protected

34

activity and the plaintiff's discharge. *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (citing *Joran v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988), *cert. denied sub. nom Jordan v. Hodel*, 488 U.S. 1006, 109 S. Ct. 786, 102 L. Ed. 2d 778 (1989); *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986)).

With respect to the first requirement for a prima facie case, Defendants argue that Ms. Dohner does not show that she engaged in protected activity, insofar as her first claim of discrimination was her PHRC complaint, which was filed after her employment was terminated. Doc. No. 25, p. 23. However, Ms. Dohner offers evidence that she made complaints about gender discrimination directly to the county commissioners that ultimately made the decision to discharge her, prior to her termination. Specifically, Ms. Dohner testifies that in February or March 2006, she prepared a memo to the commissioners complaining about discrimination because of her gender. PSOF, Ex. 1, p. 223: 7-25. Furthermore, Ms. Dohner produces a copy of a memo dated February 20, 2006, alleging a discriminatory environment and averring that Mr. Read expressly stated that a man would perform her job better. PSOF, Ex. 6. Ms. Dohner was not terminated until March 28, 2006. PSOF, ¶ 23; DRSOF, ¶ 23. While Defendants argue that this evidence is not credible, it is not appropriate for the Court to make a credibility determination at this stage. *Big Apple BMW, Inc. v. BMW of N. America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993) (holding that, "at the summary judgment stage, the court is not to weigh the evidence of make credibility determinations"). Indeed, both Mssrs. Read and McCracken testified that Ms. Dohner raised the issue of gender discrimination

at a March meeting of the commissioners, prior to her firing on March 28.[2] Because Ms. Dohner offers evidence that she complained of gender discrimination prior to the termination of her employment (*i.e.*, she engaged in protected activity), she satisfies the first requirement of a prima facie case of retaliation under Title VII.

In regard to the third requirement of a prima facie case of retaliation, Defendants argue that Ms. Dohner fails to show a causal link between the protected activity and her discharge. Defendants argue that temporal proximity alone is not sufficient to establish a causal link; however, as this Court recently discussed, the Third Circuit held that evidence of temporal proximity may be sufficient to establish a causal connection between a plaintiff's protected activity and subsequent adverse employment action. *See Miller v. Patterson Motors, Inc.*,Civil Action No. 07-33, 2009 WL 789897 at *24 (W.D. Pa. Mar. 24, 2009) (citing, *e.g., Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)) (citations omitted). In *Marra v. Phila. Housing Auth.*, the Third Circuit held:

> We have recognized that a plaintiff may rely on a 'broad array of evidence' to demonstrate a causal link between his protected activity and the adverse action taken against him. Farrell, 206 F.3d at 284. In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected activity and the adverse action may be sufficient, on its own, to establish the requisite causal connection. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997) . . . Where the time between the protected activity and adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee . . . .

497 F.3d 286, 301 (3d Cir. 2007).

Here, the Court finds that Ms. Dohner offers evidence of unusually suggestive temporal

---

[2]While Mr. Read testified that he made the decision to fire Ms. Dohner based on other reasons prior to these complaints, Mr. McCracken testified that Ms. Dohner made these complaints at a March 16 meeting, and he believed by March 23 the decision had been made to fire Ms. Dohner. PSOF, ¶ 23; DRSOF, ¶ 23.

proximity, and evidence of discrimination, from which causation could also be inferred. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000). Ms. Dohner offers evidence, as discussed above, that she made a complaint of discrimination in February 2006. She was discharged just a little over a month later. Certainly a month would be sufficiently close such that a reasonable jury could infer a causal connection between the complaint and her discharge. *See e.g.*, *Marra*, 497 F.3d at 302. Moreover, Mssrs. Read and McCracken, while denying that the memo was given to them in February, admit that Ms. Dohner made a complaint at a March meeting, one to two weeks before her discharge. Thus, even assuming that this was the first complaint of gender discrimination, the timing is nonetheless suggestive of retaliation.

Furthermore, as discussed above, Ms. Dohner offers sufficient evidence that there was ongoing antagonism against her based on her gender. Therefore, even assuming that temporal proximity alone is not enough to infer a causal connection between her complaints and her discharge, the evidence of Mr. Read's gender-motivated animus toward Ms. Dohner is sufficient to infer that her complaints about his comments were connected to the discharge decision. Therefore, Ms. Dohner offers sufficient evidence to establish a prima facie case of retaliation under Title VII.

### D.    Plaintiff's First Amendment Retaliation Claims

Ms. Dohner also asserts retaliatory discharge for exercising her rights under the First Amendment of the United States Constitution, in violation of § 1983. Defendants argue that Ms. Dohner's First Amendment retaliation claims fail as a matter of law, because Ms. Dohner fails to establish a prima facie case, as she fails to show either that she engaged in protected speech, or that the alleged "speech" is a matter of public concern. Doc. No. 25, p. 27.

To establish a claim for retaliation for exercising rights protected by the First Amendment

37

of the Constitution, a plaintiff must show: (1) that she engaged in speech protected by the First Amendment; and (2) that her speech was a motivating factor in the decision to discharge her. *Azzaro v. County of Allegheny*, 110 F.3d 968, 975 n. 4 (3d Cir. 1997).

In order to meet this first requirement, "a discharged public employee cannot receive redress in a § 1983 action simply by showing that the same speech would be protected from government sanction were it to be engaged in by a nonemployee citizen." *Id.* at 975. Rather, in order to be considered protected speech, the employee must have spoken "on a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). The Supreme Court held: "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972); *Bishop v. Wood*, 426 U.S. 341, 349-50, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976)). In order to determine whether a public employee's speech touches on a matter of public concern, the Court must look at the "content, form and context of a given statement as revealed by the whole record." *Id.* at 147. "This task does not, of course, involve the court's passing judgment on the merit of the view expressed or its source. Rather, the issue is whether it is important to the process of self-governance that communications on this topic, in this form and in this context, take place." *Azzaro*, 110 F.3d at 977.

In *Azzaro*, the Third Circuit held that an employee's speech related to a report of sexual harrassment by an assistant to a county commissioner, which occurred in the commissioner's office,

constituted speech that was a "matter of public concern." *Id.* at 978 ("We believe that this form of discrimination, when practiced by those exercising authority in the name of a public official, is as much a matter of public concern as racial discrimination practiced under similar circumstances. We also believe that [the plaintiff's] communications to [her supervisors] brought to light actual wrongdoing on the part of one exercising public authority that would be relevant to the electorate's evaluation of the performance of the office of an elected official.").

Here, Ms. Dohner offers evidence that she made a statement to the county commissioners regarding gender discrimination by an elected commissioner. Under *Azzaro*, this is certainly speech considered a matter of public concern. Therefore, Ms. Dohner provides sufficient evidence that she engaged in speech protected by the First Amendment. *See id.*

Furthermore, as discussed in the analysis of Ms. Dohner's claims of gender discrimination and retaliation, Ms. Dohner offers sufficient evidence of discriminatory animus on the part of Mr. Read, as well as evidence that she made complaints that Mr. Read discriminated against her because of her gender. *Cf. Poteat v. Harrisburg Sch. Dist.*, 33 F. Supp. 2d 384, 395-96 (M.D. Pa. 1999). In addition, Ms. Dohner offers sufficient evidence of temporal proximity between her complaints of discrimination and her discharge. Thus, to the extent needed to survive a motion for summary judgment, the Court finds that Ms. Dohner offers sufficient evidence that her protected speech was a motivating factor in the decision to discharge her. *See Satterfield v. Borough of Schuykill Haven*, 12 F. Supp. 2d 423, 436-37 (E.D. Pa. 1998) (noting that time lapse may be a relevant factor in determining motivation under retaliatory discharge). The Court finds that this is sufficient evidence that Ms. Dohner's protected speech was a motivating factor in the decision to discharge her. Therefore, Defendants' request for summary judgment on Ms. Dohner's First Amendment retaliation

39

claims is denied.

## E.    Plaintiff's Emotional Distress Damages Claims

Defendants argue that Ms. Dohner's claim for compensatory damages for emotional distress

should be stricken, as "Plaintiff has presented no evidence of any actual injury, and thus, any claims

for emotional distress, inconvenience and humiliation must be dismissed." Doc. No. 25, p. 34. In

response, Ms. Dohner argues that she is entitled to compensatory damages for emotional distress

under Title VII, as she has offered sufficient evidence of actual damages. Doc. No. 32, p. 31.[3]

Under Title VII, a plaintiff may be awarded compensatory damages for "emotional pain,

suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."

42 U.S.C. § 1981(a)(b)(3). Additionally, a plaintiff may be entitled to actual damages sustained for

emotional distress under §1983. *See Savko v. Port Auth. of Allegheny County*, 800 F. Supp. 268, 270-

71 (W.D. Pa. 1992); "Recovery of damages for such items [] depends upon a determination by the

trier of fact that [plaintiff] has been the victim of intentional discrimination and that the violation of

applicable legislation has caused her to suffer emotional distress. " *Durko v. OI-NEG TV Prods.*, 870

F. Supp. 1278, 1284 (citing *Gallo v. John Powell Chevrolet, Inc.*, 779 F. Supp. 804, 815 (M.D. Pa.

1991)).

Here, as discussed above, there are genuine issues of material fact as to whether Ms. Dohner

was the victim of intentional discrimination. Moreover, Ms. Dohner offers evidence that as a result

---

[3]The Court notes that, in their Brief in Support of Motion for Summary Judgment, Defendants argue that they are entitled
to summary judgment on Plaintiff's emotional distress claims, as (1) the County is immune from suit for emotional
distress and (2) Plaintiff has failed to establish that Defendants conduct was extreme and outrageous or that she suffered
damages as a result of Defendants' conduct. Doc. No. 25, pp. 33-34. However, Plaintiff's Complaint does not allege
a separate cause of action for the tort of either intentional or negligent infliction of emotional distress. *See* Doc. No. 1.
Rather, Plaintiff appears to be seeking damages for emotional distress under Title VII and § 1983. *See* Doc. No. 1, ¶
16(d); Doc. No. 32, p. 31. Said damages are available to compensate Plaintiff under Title VII and § 1983.

of the alleged discrimination, she suffered actual damages from emotional distress, including, *inter alia*, evidence that since the termination, she visited a psychiatrist, experienced depression and anxiety, and received medication for these symptoms. PSOF, ¶¶ 105-6. Additionally, Ms. Dohner's affidavit states that the termination of her employment affected her relationship with her husband. PSOF, ¶ 108. The Court finds this evidence is sufficient to permit Ms. Dohner to present evidence of actual damages for emotional distress to the jury. *See Evans v. Port Auth. of New York and New Jersey*, 273 F.3d 346, 352 (3d Cir. 2001). Therefore, Defendants' motion for summary judgment as to this claim will be denied.

## F.    Plaintiff's Punitive Damages Claims

Finally, Defendants argue that as a matter of law, Ms. Dohner is not entitled to punitive damages, because she does not offer evidence that Mssrs. Read and McCracken "were motivated by evil motive or intent, or reckless or careless indifference to the rights of Plaintiff." Doc. No. 25, p. 35. In response, Ms. Dohner contends that she presents sufficient evidence that Mssrs. Read and McCracken acted with reckless indifference in violation of federal discrimination laws. Doc. No. 31, pp. 34-35. Ms. Dohner argues: "It is undisputed that Defendants replaced [Ms.] Dohner with a man, and fired her just days after she complained of discrimination. If a jury considers these facts, along with other direct and indirect evidence of discrimination, it could easily conclude Defendants acted on a conscious desire to fire [Ms.] Dohner because of her sex." Doc. No. 31, p. 35.

In an employment discrimination case, a plaintiff will be entitled to punitive damages when she can show that the employer engaged in discriminatory practices with "malice or reckless indifference to the federally protected rights of an individual." 42 U.S.C. ¶ 1981(b)(1); *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999). In *Kolstad,*

41

the Supreme Court held that an employer will be liable for damages for the actions of its employees if: (1) its agent is employed in a position of managerial capacity; (2) the agent acts within the scope of the employment; and (3) the agent acts with malice or reckless indifference towards the federally protected rights of the plaintiff. *Kolstad*, 527 U.S. at 535-45. However, "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with [federal law]." *Id.* at 545 (quotations omitted).

In this case, Defendants argue that Ms. Dohner fails to show that either Mr. Read or Mr. McCracken acted with malice or reckless indifference toward her protected rights; however, the Court finds that Ms. Dohner offers evidence that suggests the possibility of Mr. Read having discriminatory animus toward her, and also evidence that shows he engaged in an investigation that Commissioner Lytle termed a "witch hunt." Furthermore, as discussed above, there are genuine issues of fact as to whether Mssrs. Read and McCracken were motivated by gender discrimination in terminating Ms. Dohner's employment, because they wanted a man to take over her job. Because these county commissioners likely knew the requirements of federal law, a reasonable jury could conclude that they acted with malice and/or reckless indifference in investigating, and ultimately discharging Ms. Dohner. Moreover, Defendant County admits that it had practices and policies in place to prevent gender discrimination, and there are genuine issues of fact as to whether Mssrs. Read and McCracken, two officials in the County's highest office, acted with indifference toward these policies. Indeed, while Defendants admit that, at some time in March, 2006, Ms. Dohner made statements complaining of gender discrimination, Defendants do not offer any evidence that they took steps to address those claims. Rather, Ms. Dohner offers evidence that, after said complaint,

her employment was terminated, and that Mr. Read contacted the district attorney to commence an investigation into her behavior while on the job.

In sum, the Court finds that genuine issues of material fact exist as to whether Defendants acted with reckless indifference to Ms. Dohner's federally protected rights; consequently, Defendants' motion for summary judgment as to punitive damages will be denied.

## V. Conclusion

In essence, the purpose of the summary judgment stage is always to determine whether a case is appropriate for trial; without question, this is a matter which depends almost entirely on credibility determinations that should be made by a jury. Consequently, Defendants' Motion for Summary Judgment is denied in its entirety. An appropriate order follows.

43

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LISA DOHNER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 3:08-52 |
| | ) | |
| v. | ) | |
| | ) | |
| CLEARFIELD COUNTY, PENNSYLVANIA, | ) | JUDGE GIBSON |
| REX READ, Clearfield County Commissioner, | ) | |
| in his individual capacity, MARK McCRACKEN, | ) | |
| Clearfield County Commissioner, | ) | |
| in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

**AND NOW**, this 28th day of August, 2009, in accordance with the foregoing Memorandum

Opinion, IT IS HEREBY ORDERED THAT the Defendant's Motion for Summary Judgment (Doc.

No. 24) is DENIED.

**IT IS FURTHER ORDERED THAT** trial in this matter will be scheduled via separate

Order of Court.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT COURT**

44